Good morning, your honors. My name is Ivy Ngo and I represent the plaintiff and appellant Stephen Rosa and the putative class. The sole issue before the court this morning is whether the district court erred in dismissing the complaint alleging materially deficient internal controls and false financials for lack of scienter without leave to amend. Defendants in this case capitalized on biodiesel tax credits, or BTCs, in order to turn a profit during the class period. The only way that they received the credit of a dollar per gallon was to blend at least 0.1% of petrodiesel with biodiesel. Based on defendant's class period statements, investors believed that defendants had properly done so during the class period. Investors learned on February 26, 2021, that the company had improperly claimed and thus had to return over $40 million to the IRS and improperly recognized and thus had to return to restate over $38 million in revenue. There is no question that defendants made false statements, and plaintiffs admit that for the following three reasons, the district court erred in not finding that the complaint had adequately alleged that defendants were at least reckless in making those statements. First, the complaint pleads actual knowledge based on the company's identification of the inventory shortage and incorrectly blended biofuel by at least September 30, 2020. Second, the complaint- And that's based on this press release. Correct, the February 26, 2021 press release. Yeah, I was having trouble seeing how the press release supports the inference that the company had actual knowledge of the blending problem as of September 30th. I mean, my understanding is that the press release announces that there are going to be amended financial results for the first three quarters. Correct. So it references those first three quarters. You hadn't yet announced earnings for future quarters, and your adversary says these BTC claims blended in the fourth quarter. The reports on them wouldn't be due until the end of March 2021. So doesn't that undercut the inference that you're arguing? The company would do their BTC credits quarterly, yes, but the fact that the company had stopped submitting false claims to the IRS by September 30th, 2020, indicates that they had to at least have identified the inventory shortage by then and also recognize that they had previously submitted false claims to the IRS. The problem had been in existence since July 2017. There's no reason that the problem would have suddenly stopped happening over the course of three years if someone at the company had not recognized the issue and put a stop to it. And then that's what plaintiffs say that we have actual knowledge. Where is the science in what you just said? The fact that the company, the inference that defendants had no idea or were not being told that they had previously submitted false claims to the IRS or once they had discovered the inventory shortage, they had notified themselves, they notified the IRS of the issue and they started an audit committee investigation. The inference that defendants had no idea or were not being told of the communications with the IRS or with the audit committee investigation is not plausible. But couldn't it be consistent with discovering the issue and working through it before making a formal disclosure? This court has previously found in the cases that defendants cite, the longest length of investigation that was found to be reasonable was two months. The fact that they would have had to have discovered the issue by September 2020 means that they waited at least five months before telling investors. And during those five months, they told investors in November 2020 that the company's internal controls were effective and the disclosure controls were effective. And they demoted the company's CFO in December 2020. During that time, they did not give any indication to the market that there were any issues with the company's internal controls. And so by the time, so then of course investors were completely surprised on February 2021 when the company announces that as of the end of 2019, the company already had deficient internal controls. And then in the follow up 10K in March 2020, the company admitted that as of the end of 2020, the company had ineffective internal controls. Is there anything in the proposed amendment that would be different from what you just described? Or is that sort of the gist of what you would add? Any amendment would be to clarify that to the extent that the court doesn't believe that the amended complaint clearly alleges knowledge by September 30, 2020. Or knowledge of the ineffective internal controls as of the June 2020 disclosure that the company had previously disclosed in inaccurate adjusted EBITDA guidance in April 2020. And when that June 2020 disclosure happened, the stock dropped over 20%. The company knew that they had to be on top of the company's revenue, BTC credits. They had to make sure that all the financial information they produced in the following quarter would be accurate and would not potentially have another issue. And so in August 2020, a month and a half later, when they issued their second quarter 2020 10Q, they affirmed that the company's disclosure controls and internal controls or financial reporting were effective. Investors thus believed that the June 2020 disclosure was a one-off. That there wasn't more material underlying weak internal controls in the company. And yet a month and a half after that, they suddenly stopped submitting false claims to the IRS. And instead, they start an IRS invest, they start the, in preparation for the 2018-2019 IRS audit, is when they discover the inventory shortage. The fact that they discovered the inventory shortage in preparation for that audit shows that they could have found that inventory shortage earlier. If they had just checked the inventory against the BTCs when they closed their books for 2019 or when they closed their books for 2018, they would have discovered the shortage. This is not a complicated reconciliation. The company sells mainly two types of fuel, B100, which is 100% biofuel, or B99, which is their blended biofuel, which is 0.01% added with the biofuel. So they have two types of fuel. The fact that you didn't have a reconciliation to show that as you were taking biodiesel and blending it with the biofuel to make your B99, to make sure that they matched up and that there weren't inconsistencies in that, is a very basic and simple control to have. Which is why, in response to this restatement, in addition to restating and giving money back to the IRS, they implemented two controls, which should have been in place the entire time for a company that touts itself as the top of its industry. They added local weekly reconciliations at the plant level, and they also added, before they submit BTC claims at the IRS, they added a month to check it against the monthly reconciliations with the plants. So those two controls are not complicated controls. So your argument is that it's not simply negligent not to have had those controls, but the failure to have those controls permits an inference that they were reckless in making statements that they had adequate controls. Right, and it's not just that they made statements about having adequate controls, but the company, but defendants, like Defendant Stone specifically said that they track the profitability and the operations of its company plant by plant. He also says that they monitor, they track these blended gallons every single quarter, which they do. They tell investors how much inventory they have, how much revenue they would have with and without the BTC credit every single quarter. This is what investors were looking at every single quarter. There's no reason that if you're then saying these are the numbers, then you didn't have some sort of process to cross-check those numbers that then you disclose to investors. We'll hear from your adversary. What's that? Thank you. Good morning, Your Honor. Mike Bongiorno from WilmerHale with Jeremy Adler on behalf of the defendants. May it please the Court. I'd like to just address a few things that were discussed this morning by plaintiff's counsel, particularly on the issue that Your Honor asked about with regard to actual knowledge. Because we go back and forth on that, or at least the plaintiffs do. On the one hand, they say they didn't have internal controls in place to find this, and therefore that was reckless, which is a very high hurdle to get over, a very high hurdle. On the other hand, they say, no, no, no, it wasn't that they didn't have internal controls in place to find this out. They did find it out. They had actual knowledge of it. So, you know, it's kind of hard to tell, you know, what the right theory would be for them to pursue, but I don't think either one works. They wouldn't be the first to pursue two alternate theories at the same time. Nor would they be the first to pursue two futile alternate theories, Your Honor. And I submit that this is one of those cases. But I will start with the actual knowledge theory because that's what the Court asked about first and was addressed this morning. Plaintiffs' counsel said this morning that the fact that the company stopped submitting false claims to the IRS by September 30th of 2020 means that they must have had actual knowledge by that date. There is nothing in the record to suggest, never mind say, that they had, that they stopped submitting false claims to the IRS by September 30th. All that the press release says is that is the last day that they need to restate because that is the last day that they reported because they hadn't reported fourth quarter financials at the point in time where they disclosed on February 25th the issues with the submissions. So any submissions made after that date, they could fix and deal with the IRS on those issues. And then when they submit their full year, because obviously you don't submit the fourth quarter separately, that goes into the 10-K. When they submit the 10-K, they could get it right. And that's what they did. And oh, by the way, the press release also says, this is at the appendix at page 172, that the company had resolved matters with the IRS two days earlier on February 23rd. So that obviously explains why the press release went out on the 25th and, you know, went out before the 10-K was issued. So the notion that this was all cleaned up, figured out by September 30th, but then they sat on it for what would be four plus months, not six months, which is what plaintiff's counsel said. So how about on the request for leave to amend? I mean, if the complaint were to add that, you know, the fuel blending issue was known about before September 30th, then would that be enough to support an inference? Two things, Judge Park. One is no, to answer your question. Absolutely not. And you've heard all of it today. Anything that would be in the amendment, you've heard about today. It's been in the briefs. It's certainly not enough. So allowing plaintiff's counsel or plaintiff to go back and amend to add something, we know now. We didn't know then, but we know now what they would have added. And you don't hear anything more. All you hear about is more reliance on this February 25th press release that they say says that the problem was known and remediated by September 30th. The press release says nothing of the sort. And the stronger inference is that that is not the case. But to the second point of whether or not they should have been allowed to amend in the first place, they had that opportunity. They chose not to do it. They chose to rely on their amended complaint. And it is an amended complaint. And the judge gave them an opportunity to amend rather than oppose the motion. They chose not to. So that's an abusive discretion standard. But even if you put that aside, we know what would go. We now know. We don't know. She didn't say why, right? She just said case closed. And so we don't know if it was for futility, which is not abuse or something else. Well, we know that the judge's pretrial order says very clearly you have two options when you get a motion to dismiss. You can either oppose it or you can amend. And if you choose to oppose it, then it is unlikely that leave to amend will be granted. And secondly, they didn't really pursue an amendment. They merely had a perfunctory boilerplate sentence in their opposition to our motion to dismiss that I've seen in every single one in my 31 years, which is. And this issue of the timing of the knowledge was briefed on the motion to dismiss? Were they on notice of the argument? Oh, they were certainly on notice of the argument. And they mention it in their briefs. I don't think they flesh it out the way they do here in the Second Circuit. But they certainly attempted to claim the two alternative theories that the judge referenced before, which is both recklessness and actual knowledge. But neither one prevailed. However, you know, it was out there. It was out there. There was no oral argument, so we didn't have this opportunity to talk about it. But it's in the briefing. So they had that chance. Just moving forward on the standard that we're dealing with here, because there's nothing I submit on the actual knowledge. We're happy to discuss that more if needed. But to move over to the recklessness standard, which I think is the standard here, at least for the blending issue. We didn't hear anything about the projections issue this morning. I can touch on that if you like. But that most certainly requires actual knowledge. But on the blending issue, all they have to go on, I believe, is recklessness. And without a motive, and there is no motive in this case whatsoever. There's not even a claim that there might be a motive. The standard for recklessness approximates the standard for actual intent, according to the Circuit. Morgan Stanley, the Novak case, which was the Ann Taylor box and hold case. I mean, those cases discuss the recklessness standard in a way that is really equivalent to an actual intent type of standard. So that is a very, very tough standard to meet. And there's no motive here. And that's the standard they're faced with. And this Circuit and other circuits have certainly said what is reasonable to do when something like this is discovered is to figure it out and then disclose it. So you don't have to make multiple disclosures and corrections over time. And even if you do, there's the Hunter-Magnum-Hunter case that we cite in our brief, another Second Circuit case from 2015 that multiple reports of inaccurate results don't even equate to scienter. But we don't have that here. We have one fix to the financials. It took time to investigate and disclose, but it certainly didn't take an unreasonable amount of time. And to disclose that the issue is out there and we're trying to figure it out is obviously not a prudent way to go about your corporate disclosures. They discovered the issue. They investigated the issue. They remediated the issue. They settled with the IRS. They announced what they had done. And then a couple of weeks later, they issued their 10-K that had all of the corrected numbers in it and the right numbers. At times in the briefing, your adversary links the two incidents. So the guidance model incident in April should have put the company on notice that its internal controls were not adequate and somehow led to more research to avoid being reckless with regard to its statements. Yes. Even as to the blended issue. Yes. So certainly. But that is not the case. These issues are not linked in any way, shape, or form. One is a projection issue. It's a forward-looking statement. It involved a couple of different factors went into the need to revise that projection. Using the wrong software, making the wrong inputs into that software during the work-from-home time a couple of years ago, as well as something that's not an issue at all, which is when they revised the projections, they had more information than they had when they made the initial projection. And so they knew more, and they had to factor that in as well. And so they adjusted downward their projection for that quarter. And, oh, by the way, the actual results from that quarter were much higher than what they had projected. However, and plaintiffs say, of course, that we should have known from just looking at that projection that was wrong. But that projection that was mistaken was in line with other projections. It is not linked at all to what was going on in Seneca, Illinois, and folks there blending or not blending in a one-off or intermittent, I should say, mechanical issue with the blending at that plant. Those two things have nothing to do with each other other than they both involve the same company and they both involve the fuel that the company was producing. But one is numbers that people were looking at at headquarters or actually at home, and the other is a manufacturing blending issue out in Seneca, Illinois. So they don't tie together in two different problems that, you know, that both don't equal Sienta, neither which equals Sienta or don't together equal Sienta. Zero plus zero still equals zero. It looks like I'm out of time. Thank you. We'll hear rebuttal. I'm glad that you guys allow for short people to have a lower table. So as to defendant's point about it being two separate teams, two separate types of accounting issues or auditing issues, it all comes down to corporate. All these numbers rolled up to corporate. The J.E. Edwards system from each of the plants rolls up to corporate. The fact that the guidance is also a part of corporate. The guidance model includes BTC assumptions, which defendants all had access to. They had access to the guidance model. They had access to the BTC assumptions, the MS exchange sheets, the reconciliation procedures, and every other information available out there to calculate the BTCs. And yet under the COSO framework, the internal controls is directly responsible by the CEO, in this case, which is defendant Warner. And so she is responsible for the company's internal controls being ineffective as the end of 2019 and the end of 2020. So they knew or recklessly disregarded that their procedures did not require high-level review and reconciliation of spreadsheets on its most critical data. That is not a COVID issue. That is just did you have someone check your numbers to make sure they were right before we announced them to investors? And with regard to the guidance issue, let's not forget that what they disclosed, the gain of $2 to $12 million was already a substantial decrease from what was previously announced. So the prior guidance was actually a gain of $37 to $38 million. And so when they then announced in April 2020 that it was a decrease of $2 to $12 million, analysts were already asking, like, what happened? Why are your numbers that much lower than what you had previously guided? And that is when Defendant Stone explicitly says, we looked at these numbers. This is what we're tracking to based on what we have seen. And so these numbers to them seemed reasonable. But the truth was those numbers were negative in the negative $2 to $12 million. How do you, how then could, based on what you have seen, could that have possibly looked reasonable regardless of whether it was COVID? And so after that point in time, you knew from the 20% drop in the stock that the investors absolutely cared about whether or not you knew what you were doing with regard to accounting. And so you should have, like, looked even more closely at what was going on with the company's revenue numbers. And by the time of whether or not it's September 30th is a hard line or it's a little bit after, either way, until November 2020, they tell investors that your internal controls were effective. So you had until November 2020. So unless the assumption is that you had no idea any of this happened until after that November 2020 10Q got issued, and for some reason you were able to do your audit committee investigation, your IRS audit, all of that within a matter of three months, four months before the February 2021 disclosure, it's just implausible that you had no idea that any of this was going on, particularly when just a month after that 10Q gets issued, the company demotes the CFO. They no longer had faith that the CFO could make representations on behalf of the company. For that reason, the company, in sum, at least acted recklessly for the entire class period, if not having actual knowledge from June 2020 or September 2020. Thank you both, and we'll take the argument under advisement. Thank you.